1

2                    UNITED STATES DISTRICT COURT

3                          DISTRICT OF NEVADA

4  SPB, NH, and JHB, individuals,          |  Case No. 3:22-cv-00340-ART-CLB

5                              Plaintiffs,  |

6        v.                                 |  *ORDER GRANTING IN PART PLAINTIFFS'*

7  WASHOE COUNTY SCHOOL DISTRICT,           |  *MOTION FOR JUDGMENT ON THE*

8                              Defendant.   |  *ADMINISTRATIVE RECORD*

9

10        Plaintiffs SPB, NH ("Parents"), and JHB ("Student") bring this action against

11   Defendant Washoe County School District ("WCSD" or "the District") alleging that

12   WCSD violated JHB's rights under the Individuals with Disabilities Education Act

13   ("IDEA").

14        Before the Court are three motions seeking summary judgment based on

15   the administrative record[1] in this case (ECF Nos. 31, 32, 33). Parties have also

16   filed several nondispositive motions, including a motion asking the Court to strike

17   an errata (ECF No. 47) and two motions for leave to file documents (ECF Nos. 51,

18   53).

19        As to the dispositive motions, the Court finds that Defendant violated its

20   child find obligation and denied JHB a free appropriate public education ("FAPE")

21   under the IDEA in February 2019. The Court declines to rule on any appropriate

22   reimbursement or equitable remedy at this time and orders Plaintiffs to file a

23   motion for reimbursement based on Defendant's IDEA violation. In other words,

24

25

---

26        [1] The administrative record ("AR") in this case is found in the sealed exhibits attached to
     ECF No. 26. The exhibits are consecutively paginated, and a table of contents is provided in ECF
27   No. 26 at 1–3. When citing to the administrative record in this case, this Order will refer to the
     consecutively paginated numbers instead of the docket entry (and its associated exhibit number
28   and page number).

the Court grants in part Plaintiffs' motion for judgment on the administrative record as to Defendant's counterclaims (ECF No. 32); denies Defendant's motion for summary judgment (ECF No. 33); and denies Plaintiffs' motion for judgment on the administrative record as to Plaintiffs' complaint (ECF No. 31.)

As to the nondispositive motions, the Court finds that Plaintiffs' most recent motion regarding remedies (ECF No. 53) effectively withdraws Plaintiffs' errata (ECF No. 46) and therefore denies Defendant's motion to strike Plaintiffs' errata (ECF No. 47) as moot. Finally, the Court grants Defendant's motion for leave to file a document (ECF No. 51) and takes judicial notice of the existence of Plaintiffs' complaint in *Brazelton et al v. Rocky Mountain Hospital and Medical Services*, 2:24-cv-00994-GMN-BNW.

## I.      FACTS

JHB began her education in WCSD in Kindergarten and remained traditionally enrolled in the District through second grade. (AR 1515, 1521–22, 1536, 3478.) During her third and fourth grade years, JHB was homeschooled through the WCSD Gifted and Talented Program. (AR 107, 1536, 1551–65, 1289, 3478.) Then, for middle school, JHB left the homeschool program to attend a private school where she excelled. (AR 1289, 1675, 3478.) Despite her strong academic performance, JHB struggled with suicidal ideation, which resulted in hospitalization in March 2018 and eventually a four-month stay in-patient treatment at Willow Springs Center ("Willow Springs"). (AR 2965, 1606, 2015–18, 2153.) JHB's treatment prevented her from completing her eighth-grade curriculum, but her parents, SPB and NH, met with Galena High School Ninth Grade Counselor Mery Mares and learned that JHB could enroll in WCSD for high school regardless. (AR 118, 363, 594–95.)

During the summer of 2018, JHB enrolled at Galena High School, and her parents remained in contact with Mares, requesting that the school provide JHB

with minor accommodations, which the school agreed to provide without a formal 504 plan.[2] (AR 30–31, 111–14, 364–72, 379, 1415, 1611–13, 1676.) JHB was discharged from Willow Springs in July with a notation that her ongoing stressors include "educational problems." (AR 1606–09.) Later that month, JHB's parents spoke with the school's nurse, Susan Munro, about JHB's mental health struggles in preparation for the new school year. (AR 596–97, 1545.) Based on this conversation and JHB's history of panic attacks, Munro put into a place a Health Care Plan which states that JHB has a "history of depression, anxiety and suicide note with plan" resulting in "[h]ospitalization" and medication. (AR 1542–45.) Believing that this "was an important condition to share with her teachers," Munro's Health Care Plan "alert[ed] the staff that if she had any of these symptoms, that [] they were to let the clinic know, and the counselor, and escort the student to a safe place[.]" (AR 417, 1542.)

Soon after the school year started, on September 29, 2018, JHB attempted suicide. (AR 1644.) As a result, she was admitted to Reno Behavioral Healthcare Hospital on October 2, 2018. (AR 1644.) Over the next few days, her parents corresponded with the school to let them know that JHB was in the hospital due to ongoing mental health struggles. (AR 1616, 1941.) On Friday October 5, 2018, JHB's parents emailed Galena school counselor Marisa Dunne saying that both JHB's psychiatrist and psychologist believe that "it is critical to get a 504 plan in place asap." (AR 382–83, 1616.) Dunne responded on the following Monday that they "can certainly move forward" in establishing a 504 plan. (AR 383, 1545,

---

[2] A "504 plan" is "a written document describing the regular or special education and related aids and services a student needs." *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 907 (9th Cir. 2020). 504 plans are created pursuant to Section 504 of the Rehabilitation Act of 1973, not the IDEA. *N.N. v. Mountain View-Los Altos Union High Sch. Dist.*, 2022 WL 3109588, at *2 n.6 (N.D. Cal. Aug. 4, 2022.) "[S]chools regularly develop 504 plans to support students who require accommodations for their disabilities," and "[m]ost students who are also eligible for an Individualized Education Program ("IEP") under the [IDEA], however, receive an IEP in lieu of a 504 plan." *McIntyre*, 976 F.3d at 907 n.4.

1617.) JHB's Parents did not respond to that email and made no request for an evaluation at that time.[3] (AR 39–40). While JHB remained hospitalized, the school's attendance office and counselors remained appraised of her hospitalization, and JHB's Parents coordinated with her schoolteachers to receive her coursework. (AR 1616–19, 1624–32, 1635–40, 1583–92, 1957–2010.)

Despite the ongoing coordination with Galena, JHB was unable to return to the school that fall. (AR 2046.) When her Parents learned on October 22, 2018 that JHB would have to be transferred back to Willow Springs, they informed her schoolteachers and Dunne about this update and their hope that she would be able to return in the spring. (AR 2023, 2046.) JHB completed her schoolwork at the school associated with Willow Springs, Truckee Meadow School, during her time there until her discharge in March of 2019. (AR 1676.)

At the start of the spring semester, Parents reached out to Dunne, Galena's school counselor, "to explore [JHB's] academic options" before her discharge from Willow Springs. (AR 2073.) Parents met Dunne on February 19, 2019. (AR 2073–82.) According to SPB's testimony before the HO, Parents went into that meeting with the goal of asking "[h]ow can we keep [JHB] in the public school system in Washoe County, have her continue towards a high school diploma," while the family "travel[led] back and forth to Sacramento for [JHB's] transcranial magnetic stimulation treatments." (AR 41–43, 397–98.) Although this out-of-state treatment was needed "to treat her suicidality and depression," Parents "want[ed] to keep [JHB] in public school[] in the Washoe County School District." (AR 40–44, 1637, 2073.) Parents allege that their request was met with a recommendation from Dunne that they "register [for] school in California," (AR 44, 1507), but Dunne testified that she had no recollection of making such an

---

[3] The record also contains evidence indicating that in August of 2018, JHB's "Parent was offered a 504 but has declined per counselor at this time." (AR 1545.)

out of character statement. (AR 400–01.) Dunne recalls that in this meeting, Parents asked her to advise on how JHB could "maintain a continuity with earning credits" while commuting to Sacramento for treatment without any discussion of a "specific return date to come to Galena." (AR 397–400). One "option" to continue "earning credits" that Dunne recalls raising is the "BYU [] online program" because "[WCSD] honor[s] credits from BYU," which would give JHB "an opportunity to continue coursework while she was in Sacramento[.]" (AR 397–401.)

A few hours after the meeting, SPB emailed NH about another option: homeschooling. (AR 1639.) Wanting to avoid being "subject [] to California state income taxes," SPB suggested that they "declare intent to home-school [JHB] upon discharge from Willow rather than state [they] have moved to California[.]" (AR 1639.) In March 2019, Parents withdrew JHB from Galena High School in order to homeschool, while also expressing JHB's "interest in returning to [Galena] for her sophomore year[.]" (AR 2087.) That same day, JHB was discharged from Willow Springs with notes in her discharge diagnosis of "educational problems" and "social support group problems." (AR 1649.)

Despite these problems, JHB's grades at Truckee Meadow School consisted of As and Bs, and upon discharge, the school recommended that she return to her "zoned school" for "regular education[.]" (AR 1653–56.) Regardless, Parents formally withdrew JHB from Galena and put together a home school plan for JHB. (AR 816–18, 1250.) In their Notice of Intent to Homeschool, Parents provided the school with an Educational Health Plan reflecting that JHB would complete grade nine with BYU Independent Study and go on to finish grades ten, eleven, and twelve at Laurel Springs School Online, though JHB never enrolled in Laurel Springs School (AR 129, 854, 1537–41.) In May 2019, Nurse Munro "called [JHB's Parents] to follow up to see what was going on, [and] how [JHB]

was doing[.]" (AR 597.) NH told Munro that JHB had been discharged from Willow Springs because "no one there was able to help her," and the family was now pursuing treatment in Sacramento. (AR 597–98.) NH testified before the HO that she appreciated the call because Munro was "sympathetic" and "understood what [she] was going through[.]" (AR 598.) Nurse Munro noted that JHB was "currently going to facility providing academic and support services which student and parents feel is a better fit for her at this time. She was withdrawn in March of 2019 but may return." (AR 421.) This was the last direct point of contact the family had with WCSD until filing a Due Process Complaint in February 2021. (*See* AR 1295, 1512, 1611–42, 3481.)

Between March 2019 and June 2020, JHB continued her homeschooling with BYU online courses, but struggled academically. (AR 48–50, 1250, 2160–71, 3373.) In March 2020, JHB was also a victim of sexual assault. (AR 52–53, 692, 807, 1675, 1677.) On June 7, 2020, this turmoil culminated in another suicide attempt, and JHB was admitted to the ICU after an overdose on over-the-counter medications. (AR 2183, 2191.) After being discharged from the ICU, JHB briefly underwent inpatient treatment at Sutter Center for Psychiatry in California ("Sutter"). (AR 2186–88, 2199, 2204–05, 2214.) In July 2020, Parents enrolled JHB at Alpine Academy, a Nevada state charter school, but JHB never attended the school because of her hospitalization. (AR 54–55, 854–55.) In August 2020, Parents took JHB from Sutter to the Menninger Clinic ("Menninger") in Houston, Texas, for inpatient psychiatric care and evaluation. (AR 55, 57, 603, 1658, 2227.)

After evaluating and diagnosing JHB, (AR 1658, 2227), Menninger recommended that Parents place JHB in residential treatment because her suicidality had a severe impact on her ability to perform daily functions, including the ability to attend school. (AR 1661, 1665, 1667.) Menninger also recommended

that Parents hire an educational consultant to help find the proper residential placement for JHB. (AR 604, 1665, 1667.) Parents chose Academic Answers, a Texas-based education consultant which recommended three options, one of which was Elevations RTC ("Elevations"). (AR 63–64, 604–06, 2464–66.) Parents conducted interviews with each facility and with students from each of the facilities before choosing Elevations. (AR 366, 604–05.)

In September 2020, JHB enrolled at Elevations, a residential treatment center with an "intensive, highly professional, therapeutic program" based in Utah and offering "recreational therapy." (AR 607–08, 622, 631–32, 2280, 2310, 2650.) One year later, in September 2021, JHB graduated from Elevations. (AR 48–50, 84, 129, 568–69, 816–17, 1541, 2065 2607, 2650, 2280–81.) While graduation from the program did not confer a high school diploma, JHB was able to pass her GED shortly after she left. (AR 607–08, 622, 631–31.) Now in need of a transitional program, JHB enrolled in the Arise Society ("Arise"), a Utah-based program, in October 2021. (AR 568–69, 2607, 2650.) JHB finished attending Arise in January 2024. (ECF Nos. 49 at 3, 46 at 1.)

## II.       PROCEDURAL HISTORY

In February 2021, Plaintiffs filed a due process complaint against Defendant under the IDEA alleging that the District violated JHB's right to a free and appropriate public education ("FAPE") by failing to identify and evaluate her for eligibility for special education and related services for which she was eligible. (AR 898–916.) In response, the District rebutted the need for a hearing and, instead, proposed that it "conduct an initial evaluation of [JHB] to determine eligibility for special education services based on parent request for an eligibility evaluation." (AR 921–26.)

Accordingly, the District retained Psychoeducational Solutions and performed an evaluation of JHB with the help of Dr. Nichole Nielsen. (AR 644,

171–72, 1672–99.) Based on her evaluation in spring of 2021, Dr. Nielsen concluded that JHB meets Nevada's requirements for emotional disturbance ("ED") and her impairments require special education services. (AR 685, 1695–96.) The District adopted this report. (AR 201, 1672–99, 1701–40.) In a subsequent evaluation qualifying JHB for special education services, Galena's school psychologist, Brian Moll, (AR 1701–40), noted that in his "opinion [] there was no evidence that would suggest that [JHB] experienced academic[] and behavioral difficulties attending Galena High School in the Fall of 2018 that would suggest the need for special education." (AR 1739.)

Given JHB's eligibility in 2021, JHB's Parents and the District met four times between June and October 2021 to participate in an after-the-fact IEP process to develop a plan that would allow JHB to receive a standard diploma. (AR 201, 342, 1701–02, 1742–1910, 1812, 2971—3297, 3031–37, 3099–3104, 3189–93, 3265–69.) At the first meeting, on June 30, 2021, the District offered JHB a place at their special school, Turning Point, but that was not a viable option because Turning Point does not provide 24/7 services. (AR 273, 296, 340, 818–19, 3031.) At the second meeting a month later, the District determined that JHB needed residential placement to access her education. (AR 3263.) JHB's Parents informed the District that Mountain Spring Preparatory Academy was not an option and that JHB would need to transition to a step down or transitional program in October. (AR 3099, 3189.) Meeting for a third time in September, JHB and her therapist from Elevations, Kim Williams-Redmond, explained to WCSD the importance of recreational activities for JHB's mental health. (AR 3189.) At the fourth and final meeting, Parents informed WCSD that JHB had obtained her GED and was planning to enroll at Arise. (AR 3265.) While WCSD agreed that the recreational therapy offered at Arise was required, the

parties were at an impasse and proceeded to an administrative hearing. (AR 346, 1906.)

At the administrative hearing in November 2021, the Hearing Officer ("HO") heard from eleven witnesses. (AR 1–828.) In March 2022, the HO issued a decision finding that WCSD did not violate its child find obligation. (AR 1283–1308.) Plaintiffs timely appealed the HO's decision to the State Review Officer ("SRO"). (AR 3359.)

In May 2022, the SRO issued a decision reversing the HO in part. (AR 3475–93.) The SRO held that WCSD's child find duty was triggered in February 2019; that the District's failure to evaluate JHB at that time was a violation of its child find duty; and that procedural violation resulted in the denial of a FAPE. (AR 3483–89.) The SRO denied Plaintiffs' requested remedy of reimbursement and instead found compensatory education to be the appropriate remedy. (AR 3489–92.)

On July 29, 2022, Plaintiffs filed the complaint in this case, asking this Court to award reimbursement and attorney's fees pursuant to the SRO's finding of a child find violation. (ECF No. 1.) Defendant filed an answer and counterclaim asking this Court to reverse the SRO decision and affirm the HO's decision that the District did not violate child find. (ECF No. 4.) On September 28, 2023, Plaintiffs filed two motions for judgment: one requesting that this Court overturn the SRO's decision regarding the appropriate remedy and another addressing the District's counterclaims. (ECF Nos. 31, 32.) On the same day, Defendant filed a motion for judgment asking this Court to reverse the SRO's decision. (ECF No. 33.)

//

//

//

1   **III.**      **THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT ("IDEA")**

2          **A. Statutory Background**

3          The IDEA was "designed to reverse a history of educational neglect for

4   disabled children. At the time of its passage, the need for institutional reform was

5   pervasive: millions of children with a multitude of disabilities were entirely

6   excluded from public schools, and others, while present, could not benefit from

7   the experience because of undiagnosed—and therefore unaddressed—

8   disabilities." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1109

9   (9th Cir. 2016) (internal citations omitted).

10         IDEA's "comprehensive educational scheme[] confer[s] on disabled

11  students a substantive right to public education." *Crofts v. Issaquah Sch. Dist.*

12  *No. 411*, 22 F.4th 1048, 1054 (9th Cir. 2022) (citation omitted); 20 U.S.C.

13  § 1400(d). "In order to 'ensure that the rights of children with disabilities and

14  parents of such children are protected,' the IDEA guarantees a [FAPE] to children

15  with disabilities[.]" *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th

16  Cir. 2013) (citation omitted); 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A); *see also* 34

17  C.F.R. § 300.1(b); 34 C.F.R. § 300.101.

18         "In addition to establishing substantive requirements, IDEA also includes

19  procedural safeguards which, if violated, may prevent a child from receiving a

20  FAPE." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 882

21  (9th Cir. 2001); *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors,*

22  *Missoula Cnty., Mont.*, 541 F.3d 1202, 1207 (9th Cir. 2008) ("A state must comply

23  both procedurally and substantively with the IDEA." (cleaned up)); 20 U.S.C.

24  § 1415. "Schools that accept IDEA funds must maintain policies and procedures

25  ensuring that a [FAPE] is available to all children with disabilities between the

26  ages of three and twenty-one." *Crofts*, 22 F.4th at 1054 (citation omitted).

27

28

1

**B. Child Find and FAPE**

2      Among the procedural requirements of the IDEA is the child find duty,

3 which "requires school districts to develop a method to identify, locate, and

4 evaluate students with disabilities who are in need of special education services."

5 *Beauchamp v. Anaheim Union High Sch. Dist.*, 816 F.3d 1216, 1221 (9th Cir.

6 2016) (citing 20 U.S.C. § 1412(a)(3)); *J.R. by & through Perez v. Ventura Unified*

7 *Sch. Dist.*, 668 F. Supp. 3d 1054, 1075 (C.D. Cal. 2023) ("School districts are

8 obligated to find and identify children who may need special education services.");

9 34 C.F.R. § 300.111; Nev. Admin. Code 388.215. "The IDEA requires that a local

10 educational agency ("LEA") conduct evaluations to determine whether a student

11 is a 'child with a disability,' and develop, in conjunction with the child's parents

12 and teachers, an individualized education plan ("IEP") for each child with a

13 disability[.]" *Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 495 (9th Cir.

14 2020) (internal citations omitted). This duty extends to those "who are enrolled

15 by their parents in private … schools located in the school district served by the

16 LEA." *N. F. by & through Flyte v. Antioch Unified Sch. Dist.*, 2022 WL 1125645, at

17 *1 (9th Cir. Apr. 15, 2022) (quoting 34 C.F.R. § 300.131); 20 U.S.C.

18 § 1412(a)(10)(A); Nev. Admin. Code 388.219; *see also Bellflower*, 832 F. App'x at

19 496. In other words, "'Child Find' encapsulates a school district's duty to assess

20 whether a child is eligible for special education once the school district is on

21 notice of a suspected disability. *Legris v. Capistrano Unified Sch. Dist.*, No. 20-

22 56261, 2021 WL 4843714, at *2 (9th Cir. Oct. 18, 2021); *see also Timothy O.*, 822

23 F.3d at 1119–20.

24      The child find obligation is triggered when a student is "suspected" of

25 having a disability for which "special education services may be needed."[4] *Dep't*

26

27      [4] In 2014, the Ninth Circuit noted that it "[had] not yet articulated a test for when the

28

11

*of Educ., State of Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1194 (D. Haw. 2001); *Timothy O.*, 822 F.3d at 1119; *J.R.*, 668 F. Supp. 3d at 1076; 34 C.F.R. § 300.111(c)(1) ("Child find also must include … Children who are suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade."). "Whether a school district 'suspects' a disability is an objective test." *J.R.*, 668 F. Supp. 3d at 1076 (citing *Timothy O.*, 822 F.3d at 1119–20). In the Ninth Circuit, a disability is "suspected … when the district has notice that the child has displayed symptoms of that disability." *Timothy O.*, 822 F.3d at 1119.

A violation of the child find procedural obligation may result in the denial of a FAPE only if the child was eligible for special education at the time of the violation. *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.,* 496 F.3d 932, 942 (9th Cir. 2007); *Burnett v. San Mateo Foster City Sch. Dist.*, 739 F. App'x 870, 872 (9th Cir. 2018); 20 U.S.C. 1415(f)(3)(E) ("In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—(I) [i]mpeded the child's right to a free appropriate public education; (II) [s]ignificantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision

---

child find obligation is triggered." *G.M. ex rel. G.M. v. Saddleback Valley Unified Sch. Dist.*, 583 F. App'x 702, 704 n.1 (9th Cir. 2014.) The most recent case discussing this issue, *Timothy O.*, discusses different ways in which a school district can be given notice that a student has displayed symptoms of a disability sufficient to trigger the child find duty. 822 F.3d at 1119–20. The duty can be triggered by parents who inform the school of their suspicion as well as the suspicion of outside experts. *Id.* at 1120; *see also Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796, 802 (9th Cir. 1996); *N.B. v. Hellgate*, 541 F.3d at 1205–10.

  The *Timothy O.* case does not fully articulate a test for when the child find obligation is triggered—it simply holds that the suspicions of parents and outside experts can put a school on notice even when the school disagrees with those suspicions. The case focuses on whether a student's evaluation was insufficient when it didn't include an autism assessment despite the district's notice of the student's symptoms of autism. 822 F.3d at 1120–21. The court explains that the student "displayed autistic-like behavior at home and at school," and therefore the district's "failure to assess [him] for all areas of suspected disability clearly and substantially violated the IDEA's procedural requirements." *Id.* at 1121.

of a free appropriate public education to the parents' child; or (III) [c]aused a deprivation of educational benefits.")

### C. Review of Administrative Decision under IDEA

"Judicial review under the IDEA is an odd creature in administrative law." *Los Angeles Unified Sch. Dist. v. A.O. by & through Owens*, 92 F.4th 1159, 1168 (9th Cir. 2024.) "Under the IDEA, federal courts reviewing state administrative proceedings are to 'receive the records of the administrative proceedings;' 'hear additional evidence at the request of a party;' and 'grant such relief as the court determines is appropriate' based on a preponderance of the evidence." *Amanda J.*, 267 F.3d at 887 (quoting 20 U.S.C. § 1415(i)(2)(B)). Given this statutory requirement, "Congress intended 'judicial review in IDEA cases to differ substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Id.* (cleaned up) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993)). Essentially, "[t]he district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference." *Capistrano Unified Sch. Dist. v. Wartenberg By & Through Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

Unlike most instances of judicial review of agency actions, "[u]nder the IDEA, federal courts accord considerably less deference to state administrative proceedings[.]" *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012); *Doug C.*, 720 F.3d at 1042 ("The deference due to the administrative findings under the IDEA is less than the high standard of deference for judicial review of most agency actions."). "Complete de novo review, however, is inappropriate." *Amanda J.*, 267 F.3d at 997. Accordingly, this modified form of de novo review requires courts to give "due weight to judgments of education policy" because

"federal judges are not experts in educating children with disabilities" and therefore "courts may not substitute their own notions of sound educational policy for those of the school authorities which they review." *Los Angeles Unified Sch. Dist.*, 92 F.4th at 1168 (internal quotation marks and citations omitted).

Of course, "[t]he proposition that the courts must give 'due weight' raises the question of how much weight is 'due.'" *Capistrano*, 59 F.3d at 891 (citations omitted). And the answer to that question "is a matter for the discretion of the courts." *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)); *Capistrano*, 59 F.3d at 891. "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion [courts] have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano*, 59 F.3d at 891 (citation omitted); *Ojai*, 4 F.3d at 1472. In particular, "[c]redibility-based findings of the ALJ deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *J.W. ex rel. K.K.W. v. Governing Bd. of E. Whittier City Sch. Dist.*, 473 F. App'x 531, 532 (9th Cir. 2012) (cleaned up) (quoting *Amanda J.*, 267 F.3d at 889).

Another unusual wrinkle that arises is that the district court must "conduct a multi-layered review of decisions" from the HO and SRO. *Amanda J.*, 267 F.3d at 887. The Ninth Circuit has explained that "in a two-tiered state administrative system," such as Nevada's,[5] "due weight should be accorded to

---

[5] *See* NAC 388.310; NAC 388.315 ("Appeal from Decision of a Hearing Officer"); *Amanda J.*, 267 F.3d at 881; *McKnight v. Lyon Cnty. Sch. Dist.*, 2018 WL 4600293, at *2 (D. Nev. Sept. 25, 2018), *aff'd*, 812 F. App'x 455 (9th Cir. 2020).

the final state determination—that of the SRO—unless the SRO's decision deviates from the credibility determination of a witness whom only the HO observed testify." *Id.* at 889. Thus, "when an SRO overturns the credibility determinations of an HO, due weight to the decision of the SRO is not warranted." *Id.* at 888; *Rogich v. Clark Cnty. Sch. Dist.*, 2021 WL 4781515, at *4 (D. Nev. Oct. 12, 2021) ("In most situations, due weight must be given to the final decision of the state authorities, which in a two-tiered system is that of the SRO." (cleaned up) (quoting *Amanda J.*, 267 F.3d at 888)).

After a court has reviewed the evidence, it must "come to its own conclusion about what relief is appropriate," allowing courts "discretion to craft appropriate relief" as they see fit. *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1182 (9th Cir. 2009) (quoting 20 U.S.C. § 1415(i)(2)(C)).

## IV.     DISCUSSION

### A. Cross Motions for Judgment on the Administrative Record[6]

Plaintiffs' complaint raises one issue[7]—that "[t]he purported remedy provided by the SRO in effect provides no remedy to Parents or Student for Defendant's violations of its child find duty and the denial of FAPE to Student." (ECF Nos. 1 at 12, 31 at 2.) In response, Defendant filed numerous counterclaims alleging that the SRO's decision contained procedural errors and substantive

_____

[6] In IDEA cases, "[t]hough the parties may call the procedure a 'motion for summary judgment' in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano*, 59 F.3d at 892.

[7] Plaintiffs' Motion for Judgment on the Administrative Record as to Defendant's Counterclaims raises an additional challenge to the SRO's decision not found in their Complaint. (ECF No. 32 at 24–25.) That motion asserts that "[t]he SRO erred in finding that District did not violate its Child Find obligation until February 23, 2019" because "[b]y no later than October, 2018, District had more than the low threshold for suspecting that Student has a disability and the IDEA required District to assess Student within a reasonable time." (*Id.* at 24.) Not only was this challenge improperly raised by the Plaintiffs, but the Court need not reach it because the statute of limitations limits the relevant time period in this case to violations occurring on or after February 23, 2019. *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 940 (9th Cir. 2017); NAC 388.306(15); 20 U.S.C. §§ 1415(f)(3)(c), 1415(d)(2)(E)(I); (AR 898, 1299.)

1    errors. (ECF No. 4 at 22–30.) Specifically, WCSD asserts that the SRO used an
2    incorrect standard of review and exceeded the proper scope of review, that the
3    SRO's analyses regarding child find, eligibility, and FAPE denial were flawed, and
4    that the SRO's compensatory education calculation was erroneous. (*Id.* at 23–
5    33.) Additionally, Defendant challenges the constitutionality of Nevada Revised
6    Statute 388.467 on two grounds. (*Id.* at 22–23.) The Court addresses first the
7    constitutional challenge, then the SRO's decision, and finally discusses the
8    remedy.

9            **B. The Constitutionality of NRS 388.467**

10          Defendant seeks a declaratory judgment from the Court that NRS 388.467
11   is unconstitutional because it improperly assigns the burden of proof to school
12   districts in special education due process hearings.[8] (ECF No. 4 at 16.) Defendant
13   offers two grounds in support of this claim. First, Defendant argues that NRS
14   388.467 is unconstitutional because it is preempted by federal law—through
15   express preemption and obstacle preemption, a form of conflict preemption. (ECF
16   No. 33 at 22–31.) Second, Defendant argues that NRS 388.467 is
17   unconstitutional as a violation of the Due Process Clause of the Fourteenth
18   Amendment. (*Id.* at 31–34.) The Court finds neither argument persuasive.

19          **1. Preemption**

20          "Preemption derives from the Supremacy Clause, which 'invalidates state
21   laws that interfere with, or are contrary to federal law.'" *Jones v. Google LLC*, 73
22   F.4th 636, 641 (9th Cir. 2023) (quoting *Hillsborough Cnty. v. Automated Med.*

---

[8] NRS 388.467, which is titled "Burden of proof and burden of production on school district during certain due process hearings," provides in full:

> Whenever a due process hearing is held pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., regarding the identification, evaluation, reevaluation, classification, educational placement or disciplinary action of or provision of a free appropriate public education to a pupil with a disability, and a school district is a party, the school district has the burden of proof and the burden of production."

NRS 388.467.

*Labs., Inc.,* 471 U.S. 707, 712–13 (1985)). The three types of preemption—express, conflict, and field—each "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018). Courts address claims of preemption "with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995).

"Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Jones*, 73 F.4th at 641. Express preemption occurs when Congress "expressly preempt[s] state law by enacting a clear statement to that effect." *Id.* (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1211 (9th Cir. 2020)). When Congress's intent to preempt state law is not express, the intent to preempt "may also be inferred … if there is an actual conflict between state and federal law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008).

State laws can be preempted by implication "where state law stands as an obstacle to the accomplishment and execution of Congress' full purposes and objectives[.]" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 281 (1995) (cleaned up) (citation omitted); *Arizona v. United States*, 567 U.S. 387, 399 (2012). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "To evaluate a claim based on [obstacle preemption] a court must identify the 'full purposes and

17

objectives' of the federal law from 'the text and structure of the statute at issue.'" *In re Volkswagen*, 959 F.3d at 1212 (quoting *Kansas v. Garcia*, 589 U.S. 191, 207–08 (2020)). "As with express preemption, courts assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017) (cleaned up) (citation omitted).

### i.   Express Preemption

Defendant first argues that NRS 388.467 is expressly preempted by IDEA and the Supreme Court's decision in *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005). (ECF No. 33 at 24–27.) NRS 388.467 places "the burden of proof and the burden of production" on the school district for hearings held under IDEA. NRS 388.467.

Defendant does not point to any text in the IDEA allocating the burden of proof or production, and it cannot: the IDEA is silent on the allocation of those burdens. *See* 20 U.S.C. § 1400 *et seq.*; *see Schaffer*, 546 U.S. at 56 ("[t]he plain text of IDEA is silent on the allocation of the burden of persuasion").[9] Because IDEA does not discuss allocation of the burden of proof, the plain text of IDEA does not expressly preempt NRS 388.467. And because there is no language in IDEA that could preempt NRS 388.467, the District relies on *Schaffer* and recent implementing regulations.

Defendant argues that NRS 388.467 is preempted because it "reduces the likelihood that disputes will be resolved, increases administrative burdens and legal expenses and does not improve educational outcomes for children." (ECF

---

[9] The *Schaffer* case concerned only the "burden of persuasion," and not the "burden of production," which historically have been two distinct burdens both encompassed by the "burden of proof." *Schaffer*, 546 U.S. at 56.

No. 33 at 25.) This, Defendant contends, conflicts with IDEA's requirement that "[e]ach State that receives funds under [IDEA] shall … minimize the number of rules, regulations, and policies to which the local educational agencies and schools located in the State are subject under this chapter." 20 U.S.C. § 1407(a)(3); *see also* 34 C.F.R. § 300.199(a)(3). Defendant concedes that this is "not an express statement of complete preemption of state law." (ECF No. 33 at 24–25.)

However, Section 1407 does not require that states minimize local schools' burden of compliance with IDEA; instead, it requires that states minimize the number of rules, regulations, and policies to which local schools will be subject. *See Blue Cross v. Travelers*, 514 U.S. at 655 (explaining that when governing text is "taken to extend to the furthest stretch of its indeterminacy" that would be "to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality"). Even if NRS 388.467 increases the burden of compliance for local schools, it does not conflict with Section 1407 because it establishes the burden of proof using one law, minimizing the need for additional rules, regulations, and policies on the issue.

Defendant next argues that NRS 388.467 is "expressly preempted by the *Schaffer* decision[.]" (ECF No. 33 at 25.) But the holding in *Schaffer* is not as far reaching as Defendant suggests. The Supreme Court in *Schaffer* held that "[a]bsent some reason to believe that Congress intended otherwise . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." 546 U.S. at 57–58. This is the default rule under IDEA, but it is not a mandatory rule. At the time the case was decided, many state laws putting the burden always on the school district existed,[10] but the Court declined to

_____

[10] The *Schaffer* decision refers to similar laws that existed at the time in Minnesota, Alaska,

19

decide the issue of whether States can override the default rule and place the burden always on the school district. *Id.* at 61–62.

To justify its reliance on *Schaffer*, Defendant asserts that "the final implementing regulations expressly adopted [the decision] as 'binding legal authority' on the IDEA burden of [persuasion] issue when determining whether any amendments to the IDEA were necessary." (ECF No. 33 at 25–26); *see also* 71 Fed. Reg. 46540, 46706 (August 14, 2006). However, it is Congress—not the courts or agencies—whose expression is considered in a preemption analysis. *Jones*, 73 F.4th at 641. Even if agencies could expressly preempt state law by incorporating judicial rulings into implementing regulations, it would not have the effect of preempting NRS 388.467. The cited regulation, promulgated by the Department of Education, merely states that "Supreme Court precedent is binding legal authority," and, therefore, there is no need for further regulation on the presumptive "allocation" of "the burden of persuasion in a hearing." 71 Fed. Reg. 46540, 46706 (August 14, 2006). By recognizing the authority of the Supreme Court's ruling, the Department of Education is not expanding the holding in *Schaffer* to one that prevents states from re-allocating the burden of proof in due process hearings brought under IDEA.

No caselaw from the Supreme Court or any circuit court[11] holds that a state law shifting the burden in IDEA cases to the school districts is expressly

---

and Delaware. 546 U.S. at 61. The Nevada statute at issue was passed after the Supreme Court's decision in *Schaffer. See* AB318 (2011.) As of 2021, "[o]nly six states—Connecticut, Delaware, Florida, New Jersey, Nevada, and New York—place the burden of proof on the school district." Jane R. Wettach & Bailey K. Sanders, *Insights into Due Process Reform: A Nationwide Survey of Special Education Attorneys*, 20 CONN. PUB. INT. L.J. 239, 245 (2021.)

[11] To support its argument, Defendant points to an Eighth Circuit case in which the court held that Eighth Circuit precedent—not the holding in *Schaffer*—prevented the application of a Minnesota law similar to the Nevada law here. *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 459 (8th Cir. 2008) ("Our decision in *Renollett* is controlling until overruled by our court en banc ... *Schaffer* [] left the question open, *and we then decided the question for the courts of this circuit.*" (emphasis added)). This case simply established that Eighth Circuit precedent

preempted by federal law. The plain text of the statute is silent on the allocation of the burden of proof. Even if the holding of a Supreme Court case could constitute express preemption when incorporated into agency regulations, the *Schaffer* holding is not as broad as Defendant contends. Therefore, Defendant's express preemption argument fails.

### ii.  Implied (Obstacle) Preemption

Defendant next argues that NRS 388.467 is preempted by implication because it is an "obstacle to the accomplishment and execution of the full purposes and objectives of the IDEA." (ECF No. 33 at 27.) Defendant argues that "[i]mposing a burden of proof on school districts in any hearing initiated by a parent increases the incentive for litigation over IEPs and other special education-related matters, which is contrary to Congressional intent." (ECF No. 33 at 29–30.)

To evaluate this claim, we first look to Congress's stated purposes in enacting IDEA. The stated purposes of IDEA are:

> (1) (A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
>
> (B) to ensure that the rights of children with disabilities and parents of such children are protected; and
>
> (C) to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities;
>
> (2) to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system

---

prevented the enforcement of Minnesota law. Like all circuits, the Eighth Circuit agrees that the holding in "*Schaffer* [] left the question open" on whether state laws can shift the burden. *Id.* And the Eighth Circuit rule preventing such laws—articulated in *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1010 n.3 (8th Cir. 2006)—is inapplicable to cases outside of the Eighth Circuit.

1

of early intervention services for infants and toddlers with disabilities and their families;

2

3

(3) to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting system improvement activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services; and

4

5

6

(4) to assess, and ensure the effectiveness of, efforts to educate children                                    with                                    disabilities.

7

8

20 U.S.C. § 1400(d). These stated purposes do not include reduction of litigation or associated costs.

9

10

Defendant argues that IDEA's structure supports its claim that "[o]ne of the central policy underpinnings of IDEA is to reduce litigation, including the costs of conducting due process hearings." (ECF No. 33 at 27) (emphasis removed). To this end, Defendant relies on *Schaffer*, which notes that "Congress has [] repeatedly amended the Act in order to reduce its administrative and litigation-related costs." 546 U.S. at 59. While it may be true that Congress amended IDEA out of concern "that a great deal is already spent on the administration of the Act," this does not clearly establish that a central purpose and objective of the law is to reduce litigation and its associated costs. *Id.*

11

12

13

14

15

16

17

18

Defendant next argues that IDEA's congressional history shows that efficiency was a central purpose at the time of enactment. (ECF No. 33 at 28–29.) But congressional history is not what courts use to determine the purpose of a law in the context of obstacle preemption. *In re Volkswagen*, 959 F.3d at 1212.

19

20

21

22

The law's text and structure do not establish that efficiency in litigation is what Congress intended to accomplish with the IDEA such that any interference with that goal would be a "sufficient obstacle" for inferring preemption. *See Crosby*, 530 U.S. at 373. On the contrary, the Supreme Court has explained that "Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided a free appropriate public education which emphasizes special education

23

24

25

26

27

28

22

and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009) (cleaned up) (citation omitted). NRS 388.467 does not interfere with this goal.

Ultimately, the Court's preemption analysis begins with "the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria*, 555 U.S.at 77 (cleaned up) (quoting *Rice*, 331 U.S. at 230). And "[i]t is of course within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion[.]" *Speiser v. Randall*, 357 U.S. 513, 523 (1958.) Therefore, the Court declines to find that NRS 388.467 is preempted.

### 2. The Fourteenth Amendment

Defendant next asserts that NRS 388.467's assignment of the burden of proof to the school district also violates the Due Process Clause of the Fourteenth Amendment because it requires the school district to bear the burden of proof even when, as here, the school district is the non-moving party. (ECF No. 33 at 31–34.) Defendant argues that principles of criminal law, which prohibit shifting the burden of proof onto defendants, should apply in this case even though it is civil, not criminal. (*Id.* at 32.) The Court does not find this argument persuasive.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. The due process rights protected by the Fourteenth Amendment include the right to a fair trial, a "basic component" of which is the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 503 (1976.) The demands of due process for criminal defendants are stringent and long established. *Coffin v. United States*, 156 U.S. 432, 453 (1895).

However, the demands of due process are more easily satisfied in the context of civil trials. *See Lilienthal's Tobacco v. United States*, 97 U.S. 237, 266 (1877). Unlike in criminal trials, where "the party accused is entitled to the legal presumption in favor of innocence," the "burden of proof in civil cases … may shift during the progress of the trial." *Id.* This burden-shifting does not offend the Fourteenth Amendment. Because this is a civil case, "a number of the concerns that are present in a criminal case are absent," including aspects of Fourteenth Amendment due process. *Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1143–44 (E.D. Cal. 2020). In civil cases, such as due process complaints filed under the IDEA, "[t]here is no presumption of innocence." *Id.*

It is true that "[w]here the burden of proof lies on a given issue is, of course, rarely without consequence and frequently may be dispositive to the outcome of the litigation or application." *Lavine v. Milne*, 424 U.S. 577, 585 (1976.) But "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Schaffer*, 546 U.S. at 58 (quoting *Lavine*, 424 U.S. at 585.) In *Schaffer*, the Supreme Court rejected petitioners' due process argument because of the civil nature of the IDEA. *Id.*

Because this is a civil case where the demands of due process are more easily satisfied, Defendant's argument that NRS 388.467 violates the Due Process Clause of the Fourteenth Amendment fails.

### C. The SRO's Decision

The party seeking relief "bear[s] the burden of demonstrating that the [SRO]'s decision should be reversed."[12] *J.W.*, 626 F.3d at 438. In addition, "the

---

[12] For clarity, the Court notes that NRS 388.467 does not govern the allocation of the burden proof in this Article III proceeding. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398 (9th Cir. 1994) (explaining that although "[t]he school clearly had the burden of proving at

party challenging the administrative decision bears the burden of persuasion on each claim challenged." *Id.* Accordingly, Defendant bears the burden of demonstrating that their challenges to the SRO's decision—including the standard and scope of the decision, the SRO's findings in favor of the Plaintiffs, and the calculated amount of compensatory education—warrant reversal. And Plaintiffs bear the burden of demonstrating that the SRO's remedy providing compensatory education and denying reimbursement should be reversed. The Court will address each issue in turn.

### 1. Standard and Scope of Review

The District alleges that the SRO erred by using an incorrect standard of review in its decision and by exceeding the proper scope of review. (ECF No. 4 at 23–24.) In particular, the District claims that the SRO "improperly overturned the []HO's credibility determinations regarding the School Psychologist" and "substitute[ed] his own credibility judgment in place of the []HO, in weighing the school counselor's testimony regarding the purpose and intent of the February 2019 meeting with Parents[.]" (ECF No. 33 at 39.) The District also claims that "[t]he SRO's eligibility determination for JHB dating back to February 2019 was beyond the scope of the five-day hearing and the SRO's own express limited issues for review."[13] (*Id.* at 40–41.)

---

the administrative hearing that it complied with the IDEA ... the party challenging an agency's decision bears the burden of proof" and noting that "[w]hether the IDEA calls for an exception to this general principle has yet to be decided in this circuit"). "In an action for judicial review of an administrative decision," including administrative decision rendered under the IDEA, "the burden of persuasion rests with the party challenging the ALJ's decision." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009.) Accordingly, NRS 388.467 governs only the allocation of the burden of proof in due process hearings held pursuant to the IDEA, not in proceedings "challenging an agency's decision[.]" *Clyde K.*, 35 F.3d at 1398.

    [13] The SRO identified three issues to be addressed in his review: (1) did the District have a child find duty that it violated; (2) if so, did the violation result in the denial of a FAPE; and (3) if so, what is the appropriate remedy? (AR 3477.)

In response, Plaintiffs argue that the HO's decision was not entitled to any deference and that the SRO did not exceed the proper scope of review because "[i]n order to address the issue of damages, both the HO and the SRO were required to determine whether Student qualified for special education services." (ECF No. 34 at 34.) The Court agrees with Plaintiffs that the District has offered no "factual [or] legal support that the SRO erred in failing to defer to the HO's finding and the SRO exceeded the scope of issues presented." (ECF No. 42 at 29.) Therefore, the Court finds that the District has failed to carry its burden of demonstrating that this challenge warrants reversal.

As the SRO states, "[t]he standard of review for a[n] SRO under the IDEA is for an 'independent decision' after examining the entire record." (AR 3477) (quoting 34 C.F.R. § 300.514(b)(2)(v)). The SRO quoted as persuasive authority the Third Circuit's decision in *Carlisle Area School v. Scott P.*, which requires "plenary review" with one narrow exception: the SRO should "defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 524 (3d. Cir. 1995).

Under the IDEA, states must give children with disabilities and their parents the "opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A); *Carlisle*, 62 F.3d at 527 ("States may choose either a one- or a two-tier administrative system."). Federal law requires that an officer reviewing the finding and decision pursuant to a hearing "shall make an independent decision upon completion of such review," and does not discuss the deference owed to the initial decision. 20 U.S.C. § 1415(g)(2); *see also* 34 C.F.R.

§ 300.514(b)(2) (requiring that the reviewing officer "must conduct an impartial review of the findings and decision appealed" by "[e]xamin[ing] the entire hearing record" and making "an independent decision on completion of the review"). Under Nevada's two-tiered system, when the decision of an HO is appealed, "a state review officer … shall conduct an impartial review of the hearing." NAC 388.315(1.) "The state review officer conducting the review shall … [e]xamine the entire record of the hearing" and "[m]ake an independent decision on the completion of the review[.]" NAC 388.315(1)(a), 388.315(1)(f).

In this case, the SRO's independent review of the record found that the HO was mistaken as to child find. The HO found that, "[d]uring the relevant period of time,[14] [the] District had no notice that Student may have had a disability and therefore it had no duty to assess Student for SPED." (AR 1302.) The HO focused his child find analysis on JHB's time at Galena in fall of 2018, during which time she "did not demonstrate any symptoms of a disability and [her] behavior and performance at High School were exemplary." (AR 1302, 3484–85.) The HO found that given this limited snapshot of what was known to the District when JHB attended Galena, and due to the fact that "[s]ubsequent to Student's departure from High School in September 2018, High School had no further access to Student, was not provided with consistent updates regarding Student's condition, and was not provided with Student's mental health and other records," the District did not have the necessary reasonable suspicion in February 2019 to trigger its child find obligation. (AR 1302.)

Upon review, the SRO explained that "resolution of the child find issue warrants a fine-grained examination … due to the fact-intensive nature of child

---

[14] Due to the timing of when Plaintiffs filed their Due Process Complaint and the applicable two-year statute of limitations, NAC 388.306(15); 20 U.S.C. §§ 1415(f)(3)(c), 1415(d)(2)(E)(I), the District is liable only for child find violations occurring on or after February 23, 2019. *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 940 (9th Cir. 2017); (AR 898, 1299.)

find; the unsettled case law with regard to the scope of educational performance and special education, including the role of attendance; and the need for judicial economy in case of appeal." (AR 3485–86.) After conducting such an examination, the SRO found, "in a relatively close call, with the burden of persuasion on the District, a violation of child find as of February 23, 2019." (AR 3488.) The SRO "agree[d] with the HO's determination for that period" that during fall of 2018 the District lacked reasonable suspicion. (AR 3485.) However, he reached a different conclusion on whether the child find obligation was triggered in February 2019. The SRO concluded that after the February 2019 meeting, "[t]he new information within the District's actual or constructive knowledge was the continuation of Student's severe psychological condition during the four months of residential treatment and impending change to an alternative treatment." (AR 3486.) This knowledge, in the context of JHB's "lack of attendance and slowed academic progress," gave the District "reason to suspect a qualifying category, such as emotional disturbance (ED) or other health impairment, and an impact on educational performance[.]" (AR 3486.) Because this finding was based on information in the record, and did not require credibility judgments, it was properly within the scope of the SRO's independent review.

Having found that there was a child find violation, the SRO next examined whether that resulted in a denial of FAPE. (AR 3484, 3488.) The SRO found that "the record [was] sufficient" to determine whether JHB was "eligible as ED and needing special education" at the time of the violation. (AR 3488.) The SRO concluded that "if the District had conducted the evaluation within the required reasonable time, it would have found Student eligible as ED and needing special education" on the "basis [that] simply but rather obviously [] in June 2021 the District duly determined that Student met these requisite criteria, and the record is quite clear that the Student's ED and resulting educational impact had not

abated during the intervening two-year period of multiple treatments." (AR 3488.) The SRO reasoned that because the District had conceded that Dr. Nielsen's 2021 evaluation of JHB found her eligible for special education services due to her ED, it follows that JHB would also have been eligible if an evaluation had been performed in February 2019 because in the intervening time "Student's psychological condition did not significantly change for the better, and its interference with Student's ability to 'attend' to education in terms of amount of time and resulting rate of progress remained at the same limited level." (AR 3489.) Therefore, the SRO found that the District's "child find violation resulted in a denial of FAPE in terms of the requisite 'deprivation of benefit,' here being the entire lack of an IEP for Student prior to the filing date that marked the end of the period at issue." (AR 3489.) The District can contest the SRO's finding that the record establishes JHB was eligible in 2019, but this finding did not exceed the SRO's scope of review.

Because the SRO used the proper standard of review and an eligibility determination was essential to resolving the issues on appeal, bringing it within the scope of review, Defendant has not carried their burden for relief on this claim.

### 2. Child Find Duty

As discussed above, the SRO found that the District failed to fulfill its child find obligation as of February 23, 2019 because "in the wake of the February 19 meeting, the District had reason to suspect a qualifying category, such as emotional disturbance (ED) or other health impairment, and an impact on educational performance, via lack of attendance and slowed academic progress, sufficient to warrant determining whether Student needed special education." (AR 3485–86.)

The District challenges the SRO's finding as erroneous. (ECF Nos. 4 at 24–29, 33 at 40.) The District asks the Court to overturn the SRO's decision on this issue because "during the period from February 23, 2019 through February 23, 2021, it had no reason to suspect JHB had a disability and required special education to receive an educational benefit." (ECF No. 33 at 36–37) (cleaned up). The District argues that the SRO erred in finding that the "meeting on February 19, 2019 in preparation for Student's discharge from [Willow], in which Parents informed school representatives of [JHB's] continued suicidality and next pending treatment," (AR 3480) and "a May 2019 phone call from the school nurse after withdrawal" were sufficient to provide the District with "reasonable suspicion … to warrant determining whether JHB needed special education." (ECF No. 33 at 38.)

The Court agrees with the SRO's finding that there is sufficient evidence in the record to support a child find violation as of February 2019. The District frames the inquiry as limited to "essentially a two-week period within the statute of limitations period, from February 23, 2019 until JHB was withdrawn to be homeschooled on March 7, 2019." (ECF No. 33 at 28.) The District provides no legal authority for limiting the analysis of whether the District was on notice of suspected disability to the statutory period. The District points to the "snapshot" rule, which "instructs the court to judge the appropriateness of the [eligibility] determination on the basis of information reasonably available to the parties at the time of the IEP meeting." *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017) (citing *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). Even if this rule extends to cases such as this—where no IEP meeting occurred—it would mean only that the Court should not consider facts after the child find violation is alleged to have occurred to determine whether the child find violation occurred. The Court may still look to facts before the

violation to determine whether the District was on notice. And as Plaintiffs point out, the Third Circuit has explained that "[l]ater-occurring facts may be relevant to other elements of a denial-of-FAPE claim premised on a breach of the child-find duty," such as "whether the child has a disability" and "how long or to what degree a school district denied a FAPE to a disabled child." (ECF No. 34 at 17 n.16); *J.M. v. Summit City Bd. Of Educ.*, 39 F.4th 126, 144-45 (3d Cir. 2022).

Here, the events of fall of 2018, though perhaps insufficient alone to provide reasonable suspicion, provide important background for the reasonable suspicion that the District should have formed after the February 2019 meeting because it knew of JHB's psychiatric history and hospitalizations over a nine month period. Even if limited to the period from February 23 to March 7, 2019, however, the District had notice of that JHB suffered from psychiatric illness that was likely a qualifying disability and that she was struggling to progress in school in light of her psychiatric hospitalizations and treatment.

In January 2019, Parents requested a meeting to explore JHB's academic options after discharge from the Willow Springs hospital. During the February 19, 2019 meeting, Parents explained that JHB was "very suicidal" and discussed her "severe depression" as the reason that they had needed to pursue transcranial magnetic stimulation ("TMS") treatments. (AR 41:14–21.) She was leaving Willow Springs because it could not provide what she needed. (ECF No. 32 at 5; AR 597–598.) Parents also explained that they wanted to keep JHB in the public school system in Washoe County while she was getting TMS treatments in California. (AR 44.) Although Parents did not specify a concern about special education at the time, they were concerned about continuity, particularly whether JHB would get credit for work she completed while at Willow Springs, and how they could keep JHB within the district while commuting to California for outpatient treatment. (AR 44, 397–401.) The school offered two

options: JHB could (1) enroll in a school in California; or (2) take BYU credits, which are accepted at Galena. (*Id.*)

After the February 19, 2019 meeting, if not before, the District had enough information to form "reasonable suspicion" that JHB had qualifying disability due to the her severe and protracted psychiatric history. The District was aware that JHB had spent more than nine of the past twelve months in a psychiatric hospital setting: she was hospitalized at Willow Springs from mid-March to mid-July 2018, hospitalized after attempting suicide at the end of September 2018, and returned to Willow Springs at the end of October 2018, where she remained in February 2019. The District was also aware that JHB was taking a variety of psychotropic medications that indicated severe and chronic mental health concerns. (AR 596:3–597:5, 754:17–755:17, 1544–1545.) The District was aware of JHB's self-harm scars. (AR 446.) During the fall of 2018, after JHB left Galena, Parents communicated with the school, informing them of JHB's suicide attempt, repeated hospitalizations, and second stay at Willow Springs. Parents explained at the February 2019 that JHB was leaving Willow Springs to obtain treatment in Sacramento for her continued, severe suicidality.

Related to her hospitalizations and psychiatric treatments were academic problems: chronic absences precluded JHB's progress at Galena; an impending discharge from Willow Springs threatened her ability to get credit for her work there; and the need for intensive outpatient treatment in California made it difficult to complete additional credits. The District argues that JHB "excelled academically" at Galena and therefore did not need special education during the first few weeks of high school in the fall of 2018. (ECF No. 33 at 36.) While true of the eight-week period (August 6 to September 29, 2018) that JHB attended Galena, this ignores the fact that JHB was unable to stay in school due to her hospitalization and earned no credit for any of her courses at Galena in fall 2018.

(AR 118:15–25, 594:20–595:25, 1917–1923.) JHB was absent from Galena due to hospitalization from September 29, 2019—after her suicide attempt—to March 7, 2019—when her parents filed their notice of intent to homeschool. (ECF Nos. 32 at 16, 33 at 34.) In fall 2018 Parents initially worked with Galena teachers and administrators to excuse her absences and missed assignments before JHB eventually withdrew to attend the school at Willow Springs. (AR 1592, 1619, 1624, 1626.) These absences had obvious adverse educational impacts: JHB's transcript for the fall 2018 semester at Galena reflects that her Term GPA was 0.0000, indicating that she failed to earn any credits, and includes a comment from her Biology teacher, "Absences impact progress." (AR 1519.)

With JHB's impending discharge from Willow Springs in February 2019, Parents were scrambling to ensure that she would earn credits there or at BYU so that she could eventually return to Galena, which was her stated goal. (AR 1642, 1941, 2046, 2064–65.) Parents received written notices from the District regarding JHB's absences. (AR 98, 2047.) After that meeting, on February 27, 2019, Parents in an email to the school counselor and registrar voiced their concern that JHB might be discharged before she completed her courses at Willow Springs, stating that she "is about ¾ of the way through her semester materials in Geometry, English, Biology and Health at Willow." (AR 1640.) That email expressed the hope that JHB could complete her courses using Willow Springs's online educational platform (Edgenuity) after being discharged and the credits would transfer to Galena upon her return. (*Id.*) Parents' March 4, 2019 email to the District, which communicated Student's intent to withdraw from Galena and notice of intent to homeschool, repeated this concern about credits with an update that JHB had completed three first semester courses (English, Geometry, and Biology) at Willow Springs, "needs to complete Health and we were hoping she can continue to do so through Edgenuity," and that she would enroll

in second semester courses at BYU. (AR 1642.) Though JHB eventually completed four first semester courses at Willow Springs (with a "Pass" and partial credit for Physical Education), she began the fall semester at Galena enrolled in seven courses. (AR 1518–19.) Thus, it is beyond dispute that her academic progress was hindered by her hospitalizations and further jeopardized by her impending discharge from Willow Springs.

While the District argues that two data points from March 2019 indicate JHB did not require special education, each must be viewed in context. First, the District points to a box checked on the Willow Springs discharge paperwork dated March 4, 2019, recommending upon discharge "zoned school, regular education." (AR 1656.) The notation has little bearing on Student's situation and possible need for special education as it was not directed at the educational dilemma Student faced. Importantly, the discharge paperwork also stated that JHB suffered from "educational problems." (AR 1649.) The purpose of the Truckee Meadows School at Willow Springs, as the principal testified, is to provide education while students are living at a behavioral hospital and getting treatment. (AR 480.) The principal explained that a transcript from the school is meant to obscure that it is at a behavioral hospital, so "It looks like – everything we do is regular education." (*Id.*) But "it's not a normal environment" for "regular" education, she testified, because "the kids live there, eat there, [] aren't seeing their parents, [] aren't going out." (AR 488–89). "It's 24 hours." (AR 478.) That JHB received good grades at Willow Springs reflects that she had adequate supports in place there to progress in school with a limited course load. Student's discharge from Willow Springs threatened that progress and her need for intensive outpatient treatment precluded her from returning to her zoned school. This much was clear to the District and Parents after the February 19 meeting, which prompted them to explore other options.

As a second data point, the District argues that Parents did not request special education in their notice of intent to homeschool form filed in March 2019. (ECF No. 33 at 37.) Parents had no duty to request special education in their notice of intent to homeschool. As Plaintiffs point out, "A key component of the child find concept is that school districts have an affirmative duty, *even in the absence of a parental request*, to identify children who may be eligible (and could benefit from) a special education." *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist.*, No. C 06-4694 JF, 2008 WL 4615436, at *1 (N.D. Cal. Oct. 17, 2008) (emphasis added); (ECF No. 34 at 1). Placing the burden on Parents to identify JHB as a student with a disability is "precisely what the Child Find duty forbids." *Culley v. Cumberland Valley Sch. Dist.*, 758 F. App'x 301, 306 (3d Cir. 2018). "[T]he IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students." *Krawietz by Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 677 (5th Cir. 2018).

In sum, the District had enough information in February and March 2019 to form "reasonable suspicion" that JHB had a disability under IDEA for which special education services may have been needed so that she could access her education. Parents' concerns about earning and transferring credits reflect that Student's severe and protracted psychiatric illness, hospitalizations, and treatments caused her to fall behind in school and made it difficult for her progress in school. The support she received at Willow Springs was disrupted by her need for outpatient treatment, which also precluded returning to her zoned school.

If the school responded adequately to Parents' concerns in February 2019, their subsequent decisions might have been different. Instead of merely suggesting enrollment in a California school or online education through BYU, the school should have offered to evaluate JHB for a qualifying disability and

explained that—if the evaluation found JHB to have a qualifying disability—they could provide her with services to address her unique needs and help her access her education. The school's failure to identify and evaluate JHB at this point amounted to a procedural violation of IDEA.

### 3. FAPE Denial

The Court also agrees with the SRO's finding that this child find violation amounted to a denial of FAPE because "if the District had conducted the evaluation within the required reasonable time, it would have found Student eligible as ED and needing special education." (AR 3488.)

The District argues that the SRO's eligibility determination was erroneous because it was "based on JHB's eligibility report from June 2021, which expressly disclaimed any use of the report for eligibility beyond that specific snapshot in time." (ECF No. 33 at 41.) The District argues that "the SRO based the eligibility determination on hindsight rather than the snapshot approach and the evidence shows that based on the information the District knew, or had reason to know as of February 19, 2019, JHB would not have been eligible for special education." (*Id.*) But, as explained above, facts occurring after the child find violation may be considered in determining whether the child find violation resulted in a denial of FAPE. *J.M. v. Summit City Bd. Of Educ.*, 39 F.4th 126 at 144–45. Therefore, the SRO was correct to consider the 2021 report as evidence in its determination of whether the child find violation resulted in a FAPE denial.

Furthermore, the SRO's analysis was not only based on that report, but on a finding that, based on the record, "Student's ED and resulting educational impact had not abated during the intervening two-year period of multiple treatments." (AR 3488.) While it is true that JHB experienced "many intervening events, traumas, treatments, and hospitalizations," there is no evidence of any significant change in JHB's mental health between 2019 and 2021. The District

contends that JHB "did not need special education as [she] strived academically without any special education supports." (ECF No. 33 at 41.) However, this assertion goes against the weight of the evidence, discussed above, which shows that at the time of the February 2019 meeting, JHB's absences from Galena, hospitalization at Willow Springs, and need for outpatient treatment due to psychiatric illness caused her to fall behind in school and threatened her continued progress after her discharge from Willow Springs.

The District received confirmation that JHB required special education within two months of her discharge from Willow Springs and notice of intent to homeschool. The school nurse testified that she spoke to Parent on the phone on May 2, 2019, and noted, "Student currently going to facility providing academic and support services which student and parents feel is a better fit for her at this time." (AR 421.) The phone call provides further evidence of JHB's need for special education in February 2019.

Because the District has failed to carry its burden on this claim, the Court affirms the SRO's finding that the District violated its procedural child find obligation in February 2019 and finds that this procedural violation resulted in a denial of FAPE.

### 4. Remedy

If a school district fails to provide a child with a FAPE, a parent or guardian may place the child in an appropriate private program and seek reimbursement. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1528 (9th Cir. 1994). However, the Supreme Court has cautioned that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. Of Burlington v. Dep't of Educ. Of Mass.*, 471 U.S. 359, 373–74 (1985). A parent may obtain reimbursement only if the public placement offered by the school district

violated the IDEA and the private school placement was "proper" under the Act. *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *Edmonds Sch. Dist. v. A.T.*, F. App'x 491, 493–94 (9th Cir. 2019); *Ashland*, 587 F.3d at 1183.

To be "proper," the residential placement must have been (1) necessary for the student to receive benefit from her education, and (2) for educational purposes, rather than a response to medical, social, or emotional problems. *Edmonds*, F. App'x at 494; *Ashland*, 587 F.3d at 1010. If both criteria are satisfied, the district court must then "exercise its 'broad discretion and weigh 'equitable considerations' to determine whether and how much, reimbursement is appropriate." *Anchorage*, 689 F.3d at 1059 (quoting *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011)). In making this determination, the court may consider "all relevant factors," including, among other things, "notice to the school district before initiating the alternative placement; the existence of other, more suitable placements; the parents' efforts in securing the alternative placement; and the level of cooperation by the school district. *Anchorage*, 689 F.3d at 1059 (citing *Forest Grove*, 523 F.3d at 1088–89 (9th Cir. 2008)).

The Court declines to make a finding on remedy at this time because the Court does not have sufficient information to determine what, if any, reimbursement or equitable remedy is appropriate. Although Plaintiffs' motion for judgment on the administrative record focuses on the appropriate remedy, it only mentions its request for monetary reimbursement in a brief footnote. (ECF No. 31 at 13 n.8.) Plaintiffs have provided an overview of costs incurred following JHB's withdrawal from the WCSD with receipts (AR 2472–563), but as Defendant points out, this fails to clearly differentiate between educational and medical expenses. (ECF No. 35 at 19.) Furthermore, Plaintiffs' motion focuses almost

entirely on Elevations, with only a brief discussion of other requested reimbursement, including expenses for Menninger and Academic Answers. (ECF No. 31 at 37–38.)

The Court orders Plaintiffs to file a motion for reimbursement based on the child find violation described in this order. This motion should include an itemized list of reimbursement costs requested, with sufficient detail and with an explanation of why reimbursement is appropriate for each line-item.[15] Defendant may file a responsive brief, and then Plaintiffs may file a reply brief.

### i.    Motion to Strike Plaintiffs' Errata

Defendant moved to strike an errata filed by Plaintiffs (ECF No 47.) In on July 15, 2024.In the errata, Plaintiffs sought to "clarify" that they are seeking reimbursement for their costs associated with JHB's time at Arise from October 2021 to January 2024. (ECF No. 46 at 1.) Plaintiffs explained that "[a]t the time of the administrative hearing on November 15–19, 2021, Student had just started her transitional program at Arise on October 1, 2021 … [and] the transitional services Student received at Arise are properly within the scope of available equitable relief." (*Id.*)

In its motion to strike, Defendant argues that the errata was an "inequitable attempt to pursue an additional remedy they intentionally disavowed on numerous occasions in this very litigation … filed approximately eight months after all the briefing was due pursuant to the Scheduling Order in this case (ECF No. 24), and just two weeks prior to oral argument on the merits of the briefings." (ECF No. 47 at 2.) Defendant requests that the Court strike the filing from the record and order sanctions against Plaintiffs. (*Id.*)

---

[15] This list should be broken down in more detail that the table provided at AR 2472-75.

Although Plaintiffs initially requested that the Court treat the errata as a motion to reinstate their claim for reimbursement of the cost of the Arise program (ECF No. 49), on September 5, 2024, they filed the same request as a motion for leave to file a motion to reinstate waived damages. (ECF No. 53.) Defendant opposed that motion. (ECF No. 55.) Because Plaintiffs have effectively withdrawn their errata, the Court denies Defendant's motion to strike as moot, and defers ruling on Plaintiffs' substitute motion (ECF No. 53).

### ii.   Request for Sanctions

In its motion to strike, Defendant also requests that the Court impose sanctions "in the form of fees and costs [incurred by Defendant] for the necessity of filing the instant Motion[.]" (ECF No. 47 at 2.)

"[T]he district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001.) This includes the "power to levy sanctions, including attorneys' fees, for willful disobedience of a court order or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *Id.* at 991 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). However, the court must exercise this inherent power "with restraint and discretion." *Chambers*, 501 U.S. at 44. Courts also have "the power to hold attorneys personally liable for fees and costs incurred by the other side as a result of their misconduct." *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1153 (9th Cir. 2024); *see also* 20 U.S.C. § 1927 (authorizing imposition of costs against anyone who "multiplies the proceedings in any case unreasonably and vexatiously").

Here, Defendant has provided no evidence that Plaintiffs have acted in bad faith by either recklessly or intentionally misleading the court or raising a frivolous argument which resulted in the multiplication of proceedings. Plaintiffs

conceded both at the hearing on July 29, 2024 and in their recent motion (ECF No. 53) that their request should not have been filed as an errata, and have filed a substitute motion to correct the error.

Because Plaintiffs' conduct does not rise to the level of "bad faith" required under Ninth Circuit precedent, the Court declines to impose sanctions.

### iii. Motion to Take Judicial Notice of Plaintiffs' Lawsuit

On August 19, 2024, Defendant filed a "Motion for Leave to File a Motion for Judicial Notice in Support of the District's Motion for Summary Judgment," requesting that this Court take judicial notice of Plaintiffs' First Amended Complaint ("FAC") in a separate lawsuit, *Brazelton et al v. Rocky Mountain Hospital and Medical Services*, 2:24-cv-00994-GMN-BNW. (ECF No. 51.) Defendant explains that Plaintiffs are "suing their insurance companies for allegedly improperly denying coverage for what Plaintiffs claim are 'medically necessary' mental health services, care and treatment for JHB's acute mental health disorders at inpatient hospitals and inpatient residential treatment facilities, including Elevations and the Menninger Clinic." (ECF No. 51 at 2.) Defendant argues that this Court should consider the FAC because it is "directly related to the substantive issues raised and addressed in the parties' competing motions for summary judgment in this case." (*Id.* at 3.)

Plaintiffs oppose Defendant's motion and argue that the present case is "not related to Plaintiffs' bad faith lawsuit against Anthem" because it relates to questions of insurance contract interpretation and HMO network insurance coverage and does not assist the Court in its determination of the relevant issues in this case (ECF No. 52 at 1-2.) Plaintiffs explain that if they are successful in their lawsuit against Anthem, "District can request an offset against any judgment ordering it to reimburse Plaintiffs for Elevations and/or Menninger, with an allocation of damages apropos to Plaintiffs' claims against Anthem and

1    subject to the common fund doctrine." (*Id.* at 7.)

2        In reply, Defendant argues that Plaintiffs' response "fails to provide any

3    legal or factual basis why leave should be denied" and again urges this Court to

4    take judicial notice of the FAC in *Brazelton et al v. Rocky Mountain Hospital and*

5    *Medical Services*, 2:24-cv-00994-GMN-BNW. (ECF No. 54.)

6        Courts may take judicial notice of their own records. *Hayes v. Woodford*,

7    444 F. Supp. 2d 1127, 1136 (S.D. Cal. 2006), *aff'd*, 276 F. App'x 576 (9th Cir.

8    2008). Federal courts may also "take notice of proceedings in other courts, both

9    within and without the federal judicial system, if those proceedings have a direct

10   relation to the matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council*

11   *v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted). The Court

12   takes judicial notice of the existence of Plaintiffs' FAC in *Brazelton et al v. Rocky*

13   *Mountain Hospital and Medical Services*, 2:24-cv-00994-GMN-BNW. However, the

14   Court does not take judicial notice of the facts within the complaint or make any

15   findings related to the allegations or claims. *See Mitchell v. Cnty. of Contra Costa,*

16   600 F. Supp. 3d 1018, 1026 (N.D. Cal. 2022) (taking notice of the existence of

17   lawsuits which involved similar allegations but declining to take judicial notice of

18   the facts within the complaints.)

19       The parties may address in their briefs the extent to which, if any, the

20   allegations in *Brazelton et al v. Rocky Mountain Hospital and Medical Services* bear

21   on the appropriate remedy in this case.

22   //

23   //

24   //

25   //

26   //

27   //

28

1  **V.    CONCLUSION**

2       It is therefore ordered that Plaintiffs' motion for judgment on the

3  administrative record as to defendant's counterclaims (ECF No. 32) is granted in

4  part and denied in part.

5       It is further ordered that Defendant's motion for summary judgment (ECF

6  No. 33) and Plaintiffs' motion for judgment on the administrative record as to

7  Plaintiffs' complaint (ECF No. 31) are denied.

8       It is further ordered that Defendant's motion to strike (ECF No. 47) is

9  denied as moot.

10      It is further ordered that Defendant's motion for leave to file a document

11 (ECF No. 51) is granted.

12      It is further ordered that Plaintiffs file a motion for reimbursement based

13 on Defendant's liability as outlined in this order.

14

15      Dated this 30th day of September 2024.

16

17

18  _____

19  ANNE R. TRAUM
    UNITED STATES DISTRICT JUDGE
20

21

22

23

24

25

26

27

28